**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LEE MAX BARNETT, | No. CIV S-99-2416 DFL CMK P |
| Petitioner, | **DEATH PENALTY CASE** |
| v. | **FINDINGS AND RECOMMENDATIONS** |
| Warden of San Quentin State Prison, | |
| Respondent. _____/ | |

Petitioner, Lee Max Barnett, who has been convicted of murder (and several other crimes) and sentenced to death seeks relief by writ of habeas corpus. Petitioner is represented by panel attorney Robert Bacon and assistant federal defendant Jennifer Corey. Currently before the court is petitioner's motion for a declaration that the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) is inapplicable to this case. This matter came on for a telephonic hearing before the court on January 23, 2007. Deputy attorney general Tami Warwick appeared for respondent, and Mr. Bacon and Ms. Corey appeared on petitioner's behalf.

///

///

///

1

I.      Factual and Procedural Background[1]

In 1988, petitioner was convicted of one count of first-degree murder, two counts of robbery, one count of assault with a firearm and four counts of kidnaping in the death of Richard Eggett and sentenced to death. The murder occurred when two groups of people unexpectedly confronted each other at a remote campsite in Butte County in July 1986. Petitioner was with one group, Richard Eggett was with the other group. There was animosity between petitioner and Eggett due to a dispute which had occurred between the two during the previous summer when they had a gold dredging partnership. Petitioner believed that Eggett had stolen gold from him and had remarked to several people that he planned to kill Eggett.

On the morning of July 6, 1986, petitioner was at a remote campsite with a group of people (the Barnett group) preparing to dredge for gold. The campsite was the same one which petitioner and Eggett had shared the previous summer. Eggett and his group (the Eggett group), which included Billy Eggett, Lloyd Hampton and Bill Cantwell, approached the campsite in Eggett's jeep. A tense confrontation ensued when the two groups met with both sides drawing guns. Petitioner was able to gain the upper hand using his rifle.

Petitioner argued with Eggett; accused Eggett of having petitioner beat up and his dog killed; and told Eggett that he planned to "blow [Eggett's] head off." Petitioner instructed everyone in Eggett's group to empty their pockets. After relieving them of their belongings, petitioner tied up Eggett, Cantwell, and Hampton. Billy Eggett was allowed to stand off to the side. Petitioner then took shotgun shells and pawn slips for gold from Eggett's jeep, indicating that he was taking the items as payback for what Eggett owed him.

Petitioner then shot Eggett in the feet. When Eggett fell to the ground, petitioner told him to get up or the next shot would be to his head. After shooting Eggett in the feet, petitioner became increasingly abusive towards Eggett; kicking and hitting him in the head, face

---

[1]A more detailed factual background is contained in People v. Barnett, 17 Cal.4th 1044, 954 P.2d 384 (1998).

and ribs with the butt of the gun; beating him with a frying pan; and throwing a small stereo speaker at Eggett's head.  Petitioner directed members of his group to bind Eggett, Hampton, and Cantwell's hands and feet.  Eggett, Hampton, Cantwell, and Billy (who was apparently not bound) were placed in Eggett's Jeep.  Petitioner and a member of his group drove the group away from the camp.

After approximately an hour of driving, petitioner stopped the Jeep and pulled Eggett out.  He started to rip Eggett's clothing off and then directed Billy to cut the rest off with a knife.  The others heard petitioner state that he planned to tie Eggett to a tree and leave him there for a couple of days for the mosquitoes to eat. After petitioner walked Eggett away from the rest of the group, Cantwell and Hampton heard Eggett screaming in pain as if being beaten. When petitioner returned to the Jeep alone approximately thirty minutes later, the screaming had stopped.

Petitioner then drove Cantwell, Hampton, Billy and his friend back to the campsite.  Once back at the camp, Petitioner untied Cantwell's and Hampton's feet and produced some methamphetamine.  Petitioner, Cantwell, and Hampton each used some methamphetamine. Petitioner then returned some of the property taken from Hampton and Cantwell.  As everyone was getting ready to leave, petitioner stated that he planned to park Eggett's Jeep up in the bushes.  Petitioner allegedly told Cantwell that he would leave a note describing the Jeep's location near Cantwell's trailer and that the Jeep was for Cantwell to keep.

Petitioner was the first one to leave the camp.  Hampton and Cantwell left together on their motorcycles[2] taking Billy with them.  Near the area where Eggett had been left, Cantwell and Hampton let Billy off Cantwell's motorcycle and told him to wait while they looked for Eggett.  Although petitioner had warned them to leave Eggett for a few days, they believed that petitioner had left the vicinity.  When they arrived at the place they thought the

---

[2]The motorcycles were apparently at the camp because the Eggett group had been at the campsite a few days before July 6, 1988 and had left a tent and motorcycles there.

1   Jeep had been parked, they honked and yelled for Eggett.  They got off their motorcycles and

2   started to walk, but immediately heard the sound of a Jeep starting.  Cantwell and Hampton

3   believed that it was petitioner in the Jeep.

4           Cantwell and Hampton got on their motorcycles and drove the other direction.

5   When the motorcycles became stuck, they abandoned them and headed to Cantwell's trailer in

6   the dark.[3]  As they walked through the hills, the methamphetamine they had taken from

7   petitioner made them hallucinate and paranoid believing that someone was following them.  The

8   two arrived at Cantwell's trailer around 9:00 a.m the next morning, July 7, 1988.  They drove

9   Cantwell's Blazer back to the camp area to look for Eggett.  They found his Jeep a short distance

10  down the hill from where he had been screaming.  Eggett's body was in the Jeep under clothing

11  and sleeping bags.  He had been stabbed to death.  Cantwell and Hampton contacted the police

12  and led them back to the Jeep.   Petitioner was arrested and charged with murdering Richard

13  Eggett in July 1996.

14          Petitioner began complaining about his counsel in the early stages of his trial, and

15  continued to do so even after substitution of initial counsel and throughout the proceedings.  For

16  example, at the preliminary hearing on July 31, 1986, petitioner requested that his attorney, John

17  Schroder, be replaced.[4]  The court denied the motion at that time, but later, on August 15, 1986,

18  granted petitioner's motion to replace his public defender with another attorney from the public

19  defender's office.  Schroder was replaced with Robert Mueller.  At the August 15 hearing

20  petitioner also described to the court various motions that he had prepared himself; however, the

21  court informed petitioner it would not accept submissions from him as he was represented by

22  counsel.

23

24          [3]The two men never returned for Billy, who walked back to the campsite and was picked
        up by law enforcement officers the next day.

25          [4]Schroder is referred to in the California Supreme Court decision as a public defender.
        However, the court also notes that Schroder had a law partner, Robert Mueller.  See Barnett, 17
26      Cal.4th at 1084-85.

1        Petitioner then filed a pro se writ of habeas corpus seeking appointment of an

2   attorney not connected with the public defender's office or Schroeder.  Meanwhile, attorney

3   Mueller petitioned the court to be relieved as counsel because he had represented prosecution

4   witness Bill Cantwell on nine different occasions.  The court appointed Jerry Kenkel to represent

5   petitioner; Kenkel was not affiliated with either the public defender's officer or attorney

6   Schroder.

7        After the jury returned a death verdict, petitioner requested new counsel to

8   investigate and file a new trial motion.  He requested new counsel because his grounds for a new

9   trial included ineffective assistance of counsel, a ground that his trial counsel could not advance.

10  The court denied petitioner's motion.  Petitioner filed a pro se motion for a new trial.  The court

11  denied the motion on November 30,1988 and imposed a judgment of death.  (Reporter's

12  Transcript (RT) at 12579, 12877-80;) (Clerk's Transcript (CT) 1351-1456, 4530-4608, 1522-

13  1536.)

14       On March 9, 1989, Mark Cutler was appointed to represent petitioner on his

15  automatic appeal to the California Supreme Court.  Attorney Cutler withdrew from the case over

16  petitioner's objections on June 5, 1991 because he had accepted other employment.  On October

17  19, 1992, the California Supreme Court appointed attorneys Michael Willemsen and Ronald

18  Parravano to represent petitioner on his direct appeal and state habeas petition.

19       In April 1994, petitioner filed a pro se motion with the California Supreme Court

20  seeking to relieve counsel and to proceed with execution.  (Doc. 206, App. 68.) In the motion he

21  averred that prison officials had destroyed records relating to his habeas petition–specifically

22  notes suggesting persons to be interviewed and records to be obtained.  In a response to

23  petitioner's motion, his counsel noted that the destruction of petitioner's papers could seriously

24  hamper the habeas investigation and noted that the unavailability of confidential visits at San

25  Quentin was hampering counsel's  ability to meet with petitioner. (Doc. 206, App. 69.)   In July

26  1994, the California Supreme Court denied petitioner's motion without prejudice, finding that

1   counsel and petitioner appeared to have reached an agreement and finding that counsel's cost

2   estimate for preparing petitioner's state habeas petition was reasonable.  (Doc. 206, App. 72.)

3   Petitioner's counsel continued to make requests for funding to investigate and prepare

4   petitioner's state habeas petition.  (Doc. 206, Apps. 74 & 76.)

5           In 1995, petitioner filed his opening brief on direct appeal.  In 1996, the State

6   filed a responding brief, and, in 1997, petitioner filed a reply brief. On May 4, 1998, the

7   California Supreme Court affirmed petitioner's judgment.  See Barnett, 17 Cal.4th 1044 (1998).

8   The petition for rehearing was denied and the United States Supreme Court denied certiorari.

9           In March 1997, petitioner filed his first state habeas petition.  The parties

10  completed briefing in September 1998, but petitioner continued to file pro se motions and claims

11  until September 1999.  The California Supreme Court denied the petition (and all of petitioner's

12  pro se filings) in November 1999 without comment.

13          Petitioner began habeas proceedings in federal court December 1999 by a request

14  for appointment of counsel.  In January 2000, Robert D. Bacon and the Office of the Federal

15  Defender, Capital Habeas Unit, were appointed as co-counsel to represent petitioner in his

16  federal habeas proceedings.  In October 2000, the court granted petitioner's motion for equitable

17  tolling of AEDPA's one-year statute of limitations for a period of 89 days.  (Doc. 25.)  Petitioner

18  was ordered to file his federal petition on or before February 14, 2001.

19          In July 2000, the California Supreme Court granted attorneys Willemsen and

20  Parravano's request to withdraw and appointed Robert D. Bacon to represent petitioner through

21  the remaining state proceedings.[5]  On April 5, 2001, attorney Bacon filed a second state habeas

22  proceeding.

23          On February 2, 2001, this court granted petitioner an additional 52 day tolling of

24  the limitations period, making his federal habeas petition due on April 19, 2001.  (Doc. 39.)

25
        ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
26          [5]By order filed March 19, 2001, this court denied petitioner's request for federal funding
    to present his state habeas petition.  (Doc. 49.)

1   Petitioner filed his federal petition on April 9, 2001.  (Doc. 54.)  By order filed March 26, 2002,

2   the court granted petitioner permission to file an amended petition, which contained only

3   exhausted claims. (Doc. 79).  The court ordered that the amended petition be held in abeyance

4   pending the outcome of petitioner's second state habeas petition.  (Id.)  Petitioner filed his first

5   amended federal petition in August 2002.

6          Petitioner, despite being represented by counsel, continued to submit pro se

7   filings to both the federal and state courts.  On August 7, 2003, the California Supreme Court

8   held that an inmate represented by counsel could not file pro se documents regarding the legality

9   of a death sentence.  See In re Barnett, 31 Cal.4th 466 (2003).  This court admonished petitioner

10  about his pro se filings.  (Docs. 70 & 78.)

11         On June 19, 2003, petitioner moved to amend his second state habeas petition, or

12  in the alternative, to file a new petition.  On November 19, 2003, the California Supreme Court

13  granted petitioner's motion to file a third state habeas petition. On July 27, 2005, the California

14  Supreme Court denied petitioner's second habeas petition.  On May 17, 2006, the California

15  Supreme Court denied petitioner's third habeas petition.

16         On July 31, 2006, this court granted petitioner's request to file a third amended

17  federal habeas petition pro nuc tunc to May 10, 2006.

18  II.     Discussion

19         Petitioner seeks a declaration that AEDPA is inapplicable to the instant case.

20  First, petitioner argues that because of the impediments placed in petitioner's way during the

21  state habeas process, AEDPA should not apply to his federal petition.  In the alternative,

22  petitioner contends that AEDPA's 1996 amendment to 28 U.S.C. § 2245(d)(1) violates Article

23  III and the Supremacy Clause of the United States Constitution.  The court has carefully

24  considered petitioner's arguments and respondent's opposition.

25  ///

26  ///

1       A.    <u>Constitutionality of AEDPA's section 2254(d)(1)</u>

2       The court addresses petitioner's second argument concerning the constitutionality

3 of 28 U.S.C. § 2254(d)(1) first because, if this provision violates the constitution, there is no

4 need to consider whether the instant petition should be exempt from AEDPA's requirements due

5 to impediments petitioner faced when filing his state habeas petition.

6       AEDPA states, in relevant part, that an application for a writ of habeas corpus

7 "shall not be granted with respect to any claim that was adjudicated on the merits in state court

8 proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or

9 involved an unreasonable application of, clearly established Federal law, as determined by the

10 Supreme Court of the United States...."  28 U.S.C. § 2254(d).

11       In other words, if a state court decision on a prisoner's ineffective assistance of

12 counsel claim correctly identified <u>Strickland</u> as the controlling legal authority for such claims

13 and, applying the <u>Strickland</u>, framework, rejected the petitioner's claims, a reviewing federal

14 court would have to affirm the state court's rejection, even if the federal court would have

15 reached a different decision applying the same framework.  <u>See</u> <u>Williams v. Taylor</u>, 520 U.S.

16 362, 460 (2000).  Petitioner argues that this violates Article III and the Supremacy Clause by

17 forcing the federal judiciary to defer to the decisions of the state courts.

18       In considering petitioner's argument, this court is bound by the law of this circuit

19 and by the decisions of the United States Supreme Court.  The Ninth Circuit has ruled that

20 AEDPA's 1996 amendments to 28 U.S.C. § 2245(d)(1) do not offend the constitution.  <u>See</u>

21 <u>Duhaime v. Ducharme</u>, 200 F.3d 597 (9th Cir. 2000).  In a recent decision, a three judge panel of

22 the Ninth Circuit stated that "we are now persuaded that <u>Duhaime v. Ducharme</u>, 200 F.3d 597

23 (9th Cir. 2000), answers [the question of whether 28 U.S.C. § 2254(d)(1) as amended by

24 AEDPA is constitutional], correctly or not, for the court.  <u>See</u> <u>Irons v. Carey</u>, No. 05-15275, n.5,

25 ___F.3d__, n. 5 (9th Cir. 2007).  The United States Supreme Court has stated that the proper

26 interpretation of § 2254(d)(1) does not present a separation of powers problem.  <u>See</u> <u>Williams</u>,

529 U.S. at 377-84. The court concludes that the question of whether 2254(d)(1), as amended by

AEDPA in 1996, is constitutional is foreclosed by controlling case law. Accordingly, the court

recommends that petitioner's claim that AEDPA does not apply to this case because §

2254(d)(1) violates Article III and the Supremacy clause be denied.

        B.      <u>AEDPA's Inapplicability due to Impediments in Filing State Habeas Petition</u>

              Petitioner's other contention is that AEDPA should not apply to his petition

because of impediments petitioner faced during the state habeas process.  Petitioner points out

that AEDPA was enacted in April 1996, more than seven years after he was sentenced in

November 1988.  He argues that if the state review process had proceeded in an appropriately

expeditious manner, his post conviction relief proceedings would have been completed in time

for him to file a federal petition prior to April 1996.  (Doc. 213 at 2.)  Petitioner contends that his

state habeas proceedings were delayed by matters outside his control, including: the trial court's

failure to appoint petitioner counsel for the purpose of preparing a motion for a new trial;

Petitioner's counsel appointed to represent him in his direct appeal withdrawing in June 1991;

the California Supreme Court's failure to appoint new appellate and habeas counsel until a year

later in October 1992, the California Supreme Court's failure to provide petitioner's counsel with

adequate funding to investigate and present his habeas claims; and prison authorities interfering

with petitioner's ability to litigate his habeas proceedings by failing to provide a confidential

setting for petitioner to communicate with his attorneys and by allegedly destroying eight years

worth of petitioner's own work concerning his habeas appeal.[6]   (Doc. 206 at 3-6.)

///

///

///

///

---

      [6]A summary of prison authorities' actions allegedly interfering with petitioner's litigation of his habeas petition is attached to Doc 206 as Appendix 2.

1        Petitioner also cites prison official's denial of his ability to earn money to finance

2  his habeas investigation through the sale of handicrafts, his 1994 stabbing and resulting loss of

3  short-term memory as state created impediments to his state habeas proceedings.  (Doc. 206 at

4  6.)

5        Petitioner argues that the court should rely on equitable principles to find that

6  AEDPA does not apply to his petition.  He argues that the principles of equitable tolling which

7  have been applied to overcome AEDPA's one-year statue of limitations are analogous to the

8  equitable remedy sought in the instant motion.  The court notes that, while AEDPA's one-year

9  limitation period is subject to equitable tolling, in order to prevail, a prisoner must demonstrate

10  (1) extraordinary circumstances beyond the prisoners control that (2) made it impossible to file a

11  petition on time. See Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002).  Equitable tolling

12  is "unavailable in most cases." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999).  Indeed,

13  "the threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the

14  rule." Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002).

15        "Whether AEDPA applies to a state prisoner turns on what was before a federal

16  court on AEDPA's effective date.  If, on that date, the state prisoner had before the federal court

17  a habeas application seeking an adjudication on the merits of the prisoner's claims, AEDPA does

18  not apply.  Otherwise, an application filed after AEDPA's effective date should be reviewed

19  under AEDPA...." Woodford v. Garceau, 538 U.S. 202, 207 (2003) (emphasis in original).  The

20  focus of AEDPA in general and of § 2254(d)(1) in particular is on revising the standards used for

21  evaluating the merits of a habeas application.  See id. at 206.  A reading of Woodford convinces

22  the court that the application of AEDPA is mandatory, not permissive, and AEDPA's application

23  should not be treated like a statute of limitations— subject to equitable tolling.

24  ///

25  ///

26  ///

1    However, even if the court were persuaded that equitable principles could allow a

2    finding that, due to delays caused by the state beyond petitioner's control, petitioner's habeas

3    application should be judged according to pre-AEDPA standards, the court could not find that

4    petitioner is entitled to such "equitable tolling."

5    First, the court notes that petitioner did not face extraordinary circumstances

6    which delayed his filing.  After his second appellate and habeas counsel were appointed in 1992,

7    petitioner still had nearly four years to file a state habeas petition, receive a decision, and, if the

8    decision was unfavorable, file a federal petition.  See e.g., Fisher v. Johnson, 174 F.3d 710, 715-

9    16 (5th Cir. 1999) (causation of late filing by extraordinary circumstances not demonstrated

10   where petitioner had over six months to complete his federal habeas petition after the termination

11   of the allegedly extraordinary circumstances).    Petitioner's counsel made a tactical decision to

12   seek further investigation and additional funds before filing petitioner's first state habeas petition

13   in March 1997, nearly a year after AEDPA's enactment.  Indeed, the court notes that after the

14   initial state habeas proceeding was submitted to the California Supreme Court, it was decided

15   within a little over one year (and just a few months after petitioner's last pro se submission).

16   A party seeking an equitable remedy must come to the court with clean hands.

17   See Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 244 (1933).   Here, petitioner

18   asserts that his case was delayed by circumstances beyond his control.  This assertion ignores

19   petitioner's numerous pro se filings in the state court.  Indeed, during the course of his habeas

20   appeal, petitioner filed at least one pro se motion seeking to have his attorney removed.  (Doc.

21   206 at App. 68, see also, App.2.)  Petitioner's attorney reported that petitioner had generally

22   objected to visits from his attorney because petitioner was concerned with a lack of

23   confidentiality.  (Id. at App. 69.) While the court recognizes that petitioner was objecting to

24   visits from his attorney due to a lack of confidentiality imposed by a California state prison,

25   petitioner could have proceeded in some other fashion beyond refusing visits with his attorney.

26   Petitioner pressed his attorney to file civil suits not related to his habeas appeal on his behalf.

1    (Id.)  Finally, although the court is sympathetic to petitioner's allegation that prison officials

2    destroyed documents relating to his habeas appeal, the court notes that the alleged destruction

3    occurred in December 1993 and January 1994, over a year after petitioner's second habeas

4    counsel were appointed to represent him, and nearly four years after his initial counsel was

5    appointed.  It seems that during that time, petitioner should have communicated information

6    pertinent to the habeas investigation to counsel, thus preserving it even if petitioner's own

7    documents were taken.

8            Instead of an external force, it was petitioner's counsel's tactical choice to pursue

9    a lengthy investigation prior to filing petitioner's first state court habeas and petitioner's own

10   refusal to cooperate with counsel that caused, or at least played a part in causing, the delay in

11   filing petitioner's state habeas appeal.  Accordingly, the court cannot find that petitioner would

12   be entitled to equitable relief, even if such were available to prevent applying AEDPA to his

13   case.[7]

14           Petitioner also argues that AEDPA should not apply to this case because applying

15   it to this case would attach new legal consequences to events which occurred in his state habeas

16   proceedings prior to April 1996.  (Doc. 206 at 9-10.)  In other words, petitioner argues that, at

17   the time that they occurred, the impediments that the state allegedly imposed on petitioner's

18   attempt to file a state habeas petition had no consequences for his case other than the delay itself.

19   However, enactment of the AEDPA in 1996 retroactively gave these impediments new adverse

20   consequences.  Specifically, it meant that petitioner would be unable to file a federal habeas

21   petition prior to April 1996, and therefore, any petition he filed would be subject to AEDPA.

22   Petitioner contends that neither Lindh v. Murphy, 521 U.S. 320 (1997) nor Woodford v.

23

24        [7]The court notes that as evidence of the delay caused by the state, petitioner has
     submitted a docket sheet showing the California Supreme Court's treatment of a death-sentenced
     defendant Robert Wilson.  The court is not persuaded by this showing.  Comparing Mr. Wilson's

25   case to Petitioner's is not possible–for instance, it is not clear whether Mr. Wilson cooperated
     with his attorneys and whether Mr. Wilson filed pro-se documents, despite being represented by

26   counsel, as petitioner did.

1    <u>Garceau</u>, 538 U.S. 202 (2003) address this argument.

2    The court rejects this argument.  While <u>Lindh</u> and <u>Woodford</u> may have been

3    silent about AEDPA attaching new legal consequences to events which occurred in state

4    proceedings prior to AEDPA's enactment, the cases were not silent about when AEDPA applied.

5    According to the Supreme Court, whether AEDPA applies to a state prisoner turns on "what was

6    before a federal court on the date AEDPA became effective."  <u>Woodford</u>, 538 U.S. at 207.  As

7    petitioner did not have a federal habeas petition pending on the merits prior to April 1996, the

8    court finds that it is clear from the case law that AEDPA would apply to his petition.

9    This is consistent with Congress's goal in enacting AEDPA in 1996–to give effect

10   to state habeas petitions to the extent possible under law and to further the principles of comity,

11   finality and federalism.  It would thwart the intent of the statute to conclude that it did not apply

12   to a federal habeas petition filed on the merits several years after 1996 because application of

13   AEDPA would attach new legal consequences to delays faced during the state habeas

14   proceedings.  Especially, when, as discussed above, a portion of the delay is attributable to

15   petitioner himself.

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

III.     Conclusion

        IT IS RECOMMENDED that petitioner's motion for a declaration that AEDPA does not apply in the instant action be denied.

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within ten days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. See  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


DATED:   March 21, 2007.



                                                   CRAIG M. KELLISON
                                                   UNITED STATES MAGISTRATE JUDGE